ALLEN, Judge.
This is an appeal by a defendant in a mortgage foreclosure case from a final decree entered against it in favor of Eduardo Morales, as Trustee, who was the plaintiff below.
A companion case to this action has been decided by the Supreme Court of Florida and is reported as Central Bank & Trust Co. v. Davis, Fla.1958, 102 So.2d 600. The instruments involved in this cause arise out of the same transactions referred to in the cited case. This cause was filed in the Supreme Court since it involved similar questions as the cited case but was transferred to this court.
The history of the background and events leading up to the execution and delivery of the mortgage sought to be foreclosed is as follows:
*427 Florida-Carolina Lumber Co. was engaged in the wholesale lumber business in Miami, Florida. Central Bank and Trust Company advanced various sums of money to Florida-Carolina Lumber Co. The loans were secured by the note of Florida-Carolina, guaranteed by P. J. Davis and Blanche Davis, his wife, together with an assignment of an account receivable in favor of Florida-Carolina against Rose Saxon Lumber Company. There was a default in the note as well as in the payment of the account receivable. Central Bank filed suit and on August 27, 1956, recovered a judgment against Florida-Carolina and the two Davises.
During the course of its operation Florida-Carolina had obtained financing from the three appellee-banks, to-wit: Dania Bank, Bank of Miami Beach, and Pan American Bank of Miami. In order to obtain such financing Florida-Carolina would order a shipment of lumber. Accompanying the shipment would be a sight draft with a bill of lading attached. On receipt of the sight draft the bank involved would advance the funds to meet the draft and hold the bill of lading as security. On arrival of the lumber in Miami, Florida-Carolina would obtain the bill of lading from the bank under a trust receipt. When the lumber was unloaded it would be placed under a warehousing arrangement with Lawrence Warehousing Company, which would in turn issue warehouse receipts for the lumber. These warehouse receipts would then be delivered to the lending bank and substituted in lieu of the trust receipts.
The effect of this transaction with the three appellee-banks was to give them a lien or charge against the lumber for the various amounts advanced by them for the purchase of the lumber. In June, 1956, due to deterioration of lumber, wastage and other causes, the three appellee-banks were notified that there was not sufficient lumber in the warehouse to meet the obligations which they held against it. The banks became dissatisfied with the management of Florida-Carolina and threatened suit.
In order to forestall the filing of suit, P. J. Davis, Charles H. Alcock and Clarence E. Hood, Jr., who owned all of the stock of Florida-Carolina, resigned as officers and directors of Florida-Carolina and placed all of their stock with a board of trustees selected by the three appellee-banks. These same three individuals owned all of the outstanding stock of Southern Creosoted Lumber Co., Inc., a separate corporation. They likewise agreed to establish a voting trust of their stock in Southern and at the same time Southern executed the mortgage in the instant case on certain of its property in Hillsborough County and guaranteed the obligations of Florida-Carolina to the three appellee-banks. These trust agreements and other security instruments were executed on or about June 30, 1956, approximately two months before the recovery of the above judgment.
The financial status of Southern Creosoted, due to the common stock ownership, was closely tied in with the financial status of Florida-Carolina. The assets of Southern Creosoted were already encumbered by a first mortgage and assignments of accounts receivable, and it was also apparent that the banks would have to continue financing Southern Creosoted, or the additional security of a second mortgage would be worthless.
The banks agreed to forego legal action for a period of six months in return for the second mortgage which necessarily entailed continued financing of Southern Creosoted by the banks. The plaintiff, Eduardo Morales, was one of the three trustees appointed to operate Southern Creosoted for the three banks involved. The banks *428 did not bring any legal action until July 17, 1957.
For approximately six weeks after execution of the voting trusts, C. E. Hood, one of the former stockholders, had charge of the sales of lumber from the Florida-Caro-liná lumber yard. According to the record, he also had the discretion to determine the price at which the lumber was to be sold, arid was paid a 7% commission on the gross sales. Due to deterioration of the lumber and mounting rental expenses, it appeared best to dispose of the remaining lumber in a bulk sale. After lengthy negotiations, and proper notice was given to all interested parties, a sale in bulk was made tb Lumber Sales, Inc. The net proceeds of the sale were applied against the indebtedness held by the three banks.
After the maturity of the mortgage sought to be foreclosed in this cause, the Bank of Miami Beach, at the insistence of the Federal Bank Examiners, assigned all of its rights in and to the obligations secured by the mortgage to certain individuals who were formerly directors of the Bank of Miami Beach.
After several hearings, the lower court announced that it was ready to enter a final decree. The defendant, Southern Creosoted Lumber Co., Inc., objected and asked for an accounting on the basis that Eduardo Morales, one of the trustees operating Southern Creosoted, was a mortgagee in possession. The defendant also alleged that the trustee had caused a $75,000 loss while operating the business, and that during operation of Southern Creosoted by plaintiff, costs of production went up while the price of raw materials went down.
At this stage of the proceeding the lower court appointed a special master to take testiriiony on the issue of an accounting. The special master in his report found that appellee. Morales, was not a “mortgagee in possession,” and that the appellant, Southern Creosoted, was not entitled to any credit against the mortgage indebtedness. The lower court entered a final decree in accord with the special master’s findings, granting foreclosure. From this decree, this appeal is taken.
Several points are stated by the appellant in its brief, only one of which we deem it necessary to discuss.
Point V, as stated by the appellant, is as follows:
“A mortgagee in possession of real property is bound to manage the property in a reasonably prudent and careful manner so as to keep it in a state of good preservation and make it productive.”
The appellant has stated the above point in such a manner as to assume that the ap-pellee was a “mortgagee in possession” and therefore subject to the standard of conduct cast by law upon a mortgagee in possession.
This foreclosure action arose out of certain instruments executed on June 28, 1956. The record shows that a Voting Trust Agreement was made and executed by P. J. Davis, Clarence E. Hood, Jr., and Charles H. Alcock, as first, second and third parties, respectively, Southern Creosoted Lumber Co., Inc., as fourth party, “and Eduardo Morales, Seymour B. Lieb-man and Leo Robinson, as parties of the fifth part, hereinafter referred to as Trustees” in which was stated that Davis, Hood and Alcock desire to create “a voting trust whereby the Trustees will have full control of said corporation (Southern Creosoted Inc.) for the use and benefit of the said Dania Bank, Bank of Miami Beach, and Pan American Bank of Miami.” Thus, the three Trustees went into possession of the mortgaged premises by virtue of the *429 Voting Trust Agreement on June 30, 1956. It is to be noted that the mortgagor, Southern Creosoted Co., Inc., is one of the parties to the agreement relinquishing possession and control to the Trustees.
The mortgage, which was executed contemporaneous with the Voting Trust Agreement, on June 28, 1956, recited: that it was executed between Southern Creosoted and Eduardo Morales as Trustee,
“ * * * and he shall hold title to the aforesaid mortgage as Trustee for each of said Banks.”;
and that the mortgage would become due six months after date of execution thereof.
• It appears from the record that from June 30, 1956, until the foreclosure action was instituted, the three Trustees were in possession under the terms of the Voting Trust Agreement, approved and signed by the mortgagor, and not by the terms of the mortgage.
In the concluding portion of the Special Master’s Report it is stated:
“From the terms and provisions of the agreement and mortgage each dated June 28, 1956, supra, I find that Eduardo Morales, as Trustee for the use and benefit of the Dania Bank, the Bank of Miami Beach and the Pan American Bank of Miami, is the sole mortgagee under and by virtue of the mortgage; and from the terms and provisions of the Voting Trust dated June 20, 1956, supra, I find that Eduardo Morales, Seymour B. Liebman and Leo Robinson, are Trustees for the use and benefit ‘of the parties and of the aforesaid banks’, i. e. P. J. Davis, Clarence E. Hood, Jr., Charles PI. Al-cock, Southern Creosoted Lumber Co., Inc., the Dania Bank, the Bank of Miami Beach and the Pan American Bank of Miami, under and by virtue of the Voting Trust. Consequently, I also find that the Trustees under the Voting Trust, — not the Mortgagee under the mortgage, — were the parties in possession of the mortgaged premises subsequent to June 30, 1956. Eduardo Morales, as Trustee under the mortgage, is the sole mortgagee. He is also one of the three Trustees under the Voting Trust; but, he is not a Trustee under the voting trust in Ms capacity as mortgagee under the mortgage. 'Neither is any one of the three Banks a party or a signatory to 'the Voting Trust. Besides, Southern Creosoted Lumber Co. Inc., is the mortgagor; and, it is also one of the parties to and signers of the Voting Trust. Consequently, the right, title and interest of the three Trustees, (Morales, Lieb-man and Robinson), under the Voting Trust, in and to the assets of Southern Creosoted, is derived from the mortgagor, Southern Creosoted * *
The rule to be applied in determining whether a party is a mortgagee in possession is stated in Miami Gardens, Inc. v. Conway, Fla.1958, 102 So.2d 622, 626:
“The authorities hold that if a mortgagee comes into possession of mortgaged premises under a title derived from the mortgagor, or from some other source, and not in recognition of or under his rights under the mortgage, he is not required to account for nor is he chargeable with the rents and profits received from the mortgaged premises in his possession. 2 Glenn on Mortgages, § 204, p. 1030 (1943); Annotation, 1926, 46 A.L.R. 138, 144; 36 Am.Jur., Mortgages, § 303.
“But the rule is otherwise when the mortgagee is in possession in recognition of the mortgage. In such cases, the mortgagee in possession is general-' *430 ly regarded as a constructive trustee who is responsible to account to the mortgagor, and those claiming under him, and he can be required to apply the proceeds of his possession to the mortgage indebtednesses on the premises in order of their priority. 59 C.J.S. Mortgages § 305. He must apply all the rents and net profits received by him to the discharge of the mortgage debt. 36 Am.Jur., Mortgages, § 301.”
Volume 59 C.J.S. Mortgages § 305, cited in the above case, states at page 391:
“a. In General
“The term ‘mortgagee in possession’ is applied to one who has lawfully acquired actual possession of the premises mortgaged to him, standing on his rights as mortgagee for the purpose of enforcing his security on such property.”
Since the Trustees were not in possession by rights granted to them under the mortgage, we must then look to the Voting Trust Agreement to ascertain the conduct that was meant to govern the Trustees in the operation of the mortgaged business.
The Agreement sets forth the purpose of the Voting Trust and standards of conduct to be observed by the trustees as follows:
“The basic purpose of the creation of this trust is to provide for the orderly liquidation of said indebtedness in the following manner:
“(a) An orderly sale and liquidation of the current assets of Southern Creosoted upon such terms and conditions and at such prices as the Trustees shall in their sole discretion deem to be to the best interests of the parties and of the aforesaid banks.” (Emphasis added.)
The Trustees were required to adhere to the above standard and make an accounting of profits and losses during the period that they operated the business. This accounting would be made as Trustees, however, not as mortgagees in possession. Although certain losses occurred, these Trustees could not be held to be insurers or guarantors that their operation of the mortgaged property would be entirely satisfactory to the defendant mortgagor. The mortgagor corporation having failed to provide for strict liability for losses against the Trustees in the agreement, the standard of reasonableness and prudence would seem to be the test to be applied.
The parties having by means of the Voting Trust Agreement put appellee Morales along with the other Trustees in possession of the mortgaged property, with stated discretionary duties, they can require the Trustees to account only for proceeds actually received, and for expenses actually incurred pursuant to the terms of the Agreement, in the absence of a showing of fraud, bad faith, or gross negligence on the part of the Trustees. In making the accounting, actualities alone should be considered. Estimates or guesses as to what could have been realized from the operation of Southern Creosoted should not be considered, where the person whose duty it is to account has acted in good faith, with reasonableness and within the trust conferred upon him. Terwilligar v. Ballard, 1912, 64 Fla. 158, 59 So. 244.
We find no error in the record upon which to reverse the lower court. The final decree is affirmed in all respects.
KANNER, C. J., and OGILVIE, CLAUDE, Associate Judge, concur.